**CITY OF SEABROOK, TEXAS, et al., Petitioners,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent.**

Nos. 80–1138, 80–1520.

United States Court of Appeals,
Fifth Circuit.*
Unit A

Oct. 30, 1981.

Rehearing and Rehearing En Banc Denied Dec. 3, 1981.

---

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

James M. Scott, Jr., Sugarland, Tex., for petitioners.

Douglas M. Costle, Administrator, Eric Smith, Mitchell H. Bernstein, E. P. A., Jose R. Allen, Atty., Land and Natural Resources Div., Dept. of Justice, Washington, D. C., for respondent.

Jim Mathews, Asst. Atty. Gen., Environmental Protection Div., Austin, Tex., for the State of Tex.

Before REAVLEY, RANDALL and SAM D. JOHNSON, Circuit Judges.

REAVLEY, Circuit Judge:

The City of Seabrook and four residents of Harris County, Texas filed two petitions asking this court to set aside the action taken by the Administrator of the Environmental Protection Agency in approving and conditionally approving various portions of the plan adopted by the state of Texas to comply with the Clean Air Act Amendments of 1977.[1] We consolidated the petitions and granted the state's motion to intervene. We now deny the petitions.

---

1. Petitioners also filed a suit in federal district court challenging some of the same actions. Petitioners' appeal from the district court's dismissal of the suit, which was consolidated for oral argument with their petitions, is also decided today. *City of Seabrook v. Costle*, 659 F.2d 1371 (5th Cir. 1981).

## I. Statutory and Factual Background

The Clean Air Act Amendments of 1977, Pub.L.No. 95–95, 91 Stat. 685 [hereinafter cited as 1977 Amendments], added a new Part D to Subchapter I of the federal Clean Air Act, 42 U.S.C. §§ 7401 et seq. (Supp. III 1979) [2] [hereinafter cited as CAA]. Part D was added because many states had failed to attain the "national primary ambient air quality standards" despite their adoption and the EPA's approval of "state implementation plans" ("SIPs"), which had been designed to attain those standards by 1975. See H.R.Rep.No.294, 95th Cong., 1st Sess. 208–10, reprinted in [1977] U.S.Code Cong. & Ad.News 1077, 1286–87. The 1977 Amendments required the EPA to identify the areas in each state which did not meet the national standards,[3] and required each state to revise its implementation plan for these "nonattainment areas."[4] Section 172 of Part D specified the provisions to be included in the revised plans. CAA § 172(a)(1), (b)(1)–(10), 42 U.S.C. § 7502(a)(1), (b)(1)–(10). The foremost requirement of § 172 was that the plan "provide for attainment" of the national primary standards "not later than December 31, 1982." CAA § 172(a)(1), 42 U.S.C. § 7502(a)(1).[5] Section 172(a)(2) and (b)(11) required additional provisions in a SIP if the state received an extension beyond this 1982 deadline. 42 U.S.C. § 7502(a)(2), (b)(11).

Texas was required to submit a Part D SIP revision for several "nonattainment areas." In addition, Texas asked for an ex-tension for attainment of the photochemical oxidants (ozone) standard for Harris County; therefore, it was required to include in its plan for Harris County the additional provisions listed in § 172(a)(2) and (b)(11).

Petitioners complain that the procedures adopted by the EPA in passing on the state's Part D revisions—in particular, the use of "conditional approval"—violated the deadlines set by the statute. They also argue that the state's plan failed to satisfy many of the substantive requirements of Part D. We deal first with the EPA's procedures, and then with the substance of the Texas plan.

## II. The Statutory Deadlines and "Conditional Approval"

### A. The State's Failure to Comply with the Statutory Deadlines

Under the 1977 Amendments, Texas was required to identify and submit a list of its nonattainment areas by December 5, 1977; the Administrator of the EPA was required to "promulgate" the list "with such modifications as he deem[ed] necessary" not later than 60 days after its submission. CAA § 107(d)(1)–(2), 42 U.S.C. § 7407(d)(1)–(2). Texas was then required to submit its Part D revisions by January 1, 1979. 1977 Amendments, Pub.L.No.95–95 § 129(c), 91 Stat. 685 as amended by Pub.L.No.95–190 § 14(b)(4), 91 Stat. 1393 (see note under 42 U.S.C. § 7502). The EPA, in turn, was required to "approve or disapprove" the plan by May 1, 1979.[6] If Texas failed to submit a plan by January 1, or if the EPA

---

**2.** All code citations for the Clean Air Act are to the 1979 supplement to the 1976 edition, unless otherwise indicated. After the Act was amended in 1977, its provisions were transferred from 42 U.S.C. §§ 1857–1858a to 42 U.S.C. §§ 7401–7642. In order to minimize the confusion concerning the section to which we are referring, in textual discussion we refer to the sections as designated in the Act itself, and we provide citations to the sections of 42 U.S.C. in which the Act is currently codified.

**3.** See 42 U.S.C. § 7407(d).

**4.** The operative provision of the 1977 Amendments was § 108(b), which added subparagraph (I) to the requirements for every SIP listed in § 110(a)(2) of the Act. See 42 U.S.C. § 7410(a)(2)(I). Subparagraph (I) requires ev-ery SIP to provide that, after June 30, 1979, no construction or modification of a major stationary source of a pollutant will take place in an area designated "nonattainment" for such pollutant unless the SIP meets the requirements of Part D. Id.

**5.** While December 31, 1982 was set as a deadline for the primary standards, § 172(a)(1) required the plan to provide for the attainment of all national ambient air quality standards—both primary and secondary, see 42 U.S.C. § 7409—"as expeditiously as practicable." 42 U.S.C. § 7502(a)(1).

**6.** This deadline was set, not by the 1977 law itself, but by § 110(a)(2) of the existing Clean Air Act, which provides that "[t]he Administrator shall, within four months after the date

determined that the plan or a portion of the plan should be disapproved, the EPA was required to "*promptly* prepare and publish proposed regulations setting forth an implementation plan, or portion thereof." CAA § 110(c)(1), 42 U.S.C. § 7410(c)(1) (emphasis added). With a single exception to be discussed later, the EPA was required to promulgate the regulations it had proposed by July 1, 1979. *Id.*

Texas and the EPA quickly fell behind this statutory schedule. The Texas Air Control Board (TACB) did not adopt a list of "nonattainment areas" until January 9, 1978. While the EPA published what purported to be a "final rule" on March 3, 1978, within the 60-day deadline, *see* 43 Fed.Reg. 8962, 9037–38, the publication functioned in one way as a notice of proposed rulemaking, since it solicited comments which it would consider in "revising" the "final" nonattainment designations. *Id.* at 8962.[7] A second "final rule" was published on September 11, 1978, 43 Fed.Reg. 40412, in which the EPA designated an additional Texas nonattainment area, *id.* at 40418, 40433. Texas did not submit its SIP revisions until April 13, 1979. The EPA did not approve or disapprove the revisions by May 1, 1979, and it did not promulgate its own implementation plan for Texas by July 1, 1979.

Instead, the EPA published a notice on August 1, 1979, proposing to approve the SIP revisions in part, "conditionally approve" in part, and disapprove in part, and it invited public comment on its proposals. 44 Fed.Reg. 45204. The EPA took "final" action on these proposals in two installments. On December 18, 1979 the EPA granted the state's request for an extension

of the attainment date for the ozone standards in Harris County, and it fully approved the vehicle inspection and maintenance provisions thereby required to be added to the SIP, *see* CAA § 172(b)(11)(B), 42 U.S.C. § 7502(b)(11)(B). 44 Fed.Reg. 74830, 74832. On March 25, 1980, the EPA published a "final rule" approving and "conditionally approving" the remaining portions of the SIP revisions,[8] in most instances following its August 1 proposals. 45 Fed.Reg. 19231.

### B. *Conditional Approval*

The EPA granted "conditional approval" to the Texas SIP revisions pursuant to a policy statement published on July 2, 1979. 44 Fed.Reg. 38583. In this statement, the EPA announced that it would grant conditional approval if "a plan has been revised so as to be in *substantial compliance* with the requirements of Part D, and the state provides [strong] assurances that any remaining minor deficiencies will be remedied within a short period." *Id.* (emphasis added). The EPA cautioned, however, that if the state failed to make the needed corrections on the "specified schedule" set out in the notice of conditional approval,[9] it would withdraw the conditional approval and disapprove the plan. *Id., as supplemented by* 44 Fed.Reg. 67182 (Nov. 23, 1979).

Petitioners argue that the statutory command that the EPA "shall ... approve or disapprove," § 110(a)(2), 42 U.S.C. § 7410(a)(2), leaves no room for the device of "conditional approval." A "conditional approval," they argue, is in effect a determination that the SIP is "not ... in accordance with the requirements" of the statute,

required for submission of a plan ..., approve or disapprove such plan or each portion thereof." 42 U.S.C. § 7410(a)(2).

**7.** The procedure the EPA employed in its attempt to meet the statutory deadlines drew differing reviews from the courts. *Compare United States Steel Corp. v. USEPA*, 595 F.2d 207, 213–15 (5th Cir. 1979) (holding that, notwithstanding the statutory deadlines, EPA should have complied with the rulemaking procedures of the Administrative Procedure Act), *clarified on other grounds*, 598 F.2d 915 (5th Cir. 1979), *and Sharon Steel Corp. v. EPA*, 597 F.2d 377, 379–81 (3d Cir. 1979) (same), *with*

*United States Steel Corp. v. USEPA*, 605 F.2d 283, 286–91 (7th Cir. 1979) (contra), *cert. denied*, 444 U.S. 1035, 100 S.Ct. 710, 62 L.Ed.2d 672 (1980).

**8.** The EPA also took no action on a few portions of the SIP. Petitioners raise no objection to the EPA's reasons for deferring action on these few portions.

**9.** This schedule was to be negotiated by the state and the EPA regional office prior to the grant of conditional approval. 44 Fed.Reg. at 38583.

a determination that requires the EPA to promulgate an implementation plan for the state. CAA § 110(c)(1)(B), 42 U.S.C. § 7410(c)(1)(B).

The EPA, of course, interprets § 110 differently. In evaluating its interpretation, we are mindful of the Supreme Court's admonition that if the EPA's construction of the Act is reasonable, we must hold that it is " 'correct,' to the extent that it can be said with complete assurance that any particular interpretation of a complex statute such as this is the 'correct' one." *Train v. NRDC*, 421 U.S. 60, 87, 95 S.Ct. 1470, 1485, 43 L.Ed.2d 731 (1975). As the District of Columbia Circuit recently reiterated:

> Where different interpretations of the statute are plausible, so long as EPA's construction of the statute is reasonable we may not substitute our own interpretation for the Agency's. [*Train v. NRDC*, 421 U.S. at 75, 95 S.Ct. at 1479.] "[T]he construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong[.]" *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1967) .... Deference to the Administrator's interpretation is particularly ap-

propriate in construing a statute that invests him with a considerable amount of discretion. Unless it can be shown that the Administrator's construction of the statute is plainly unreasonable, we must uphold his interpretation.

*Lead Industries Association, Inc. v. EPA*, 647 F.2d 1130, 1147 (D.C.Cir.) (citations and footnote omitted), *cert. denied*, 449 U.S. 1042, 101 S.Ct. 621, 66 L.Ed.2d 503 (1980).

The EPA contends that § 110(c)(1)(C) supports its conditional approval policy. An assessment of this argument requires an examination of the anatomy of § 110. Subsection (a)(2) provides that "[t]he Administrator shall, within four months after the date required for submission of a plan ... approve or disapprove such plan or each portion thereof." Paragraph (2) goes on to provide that "the Administrator shall approve such plan, or any portion thereof" if he finds that it meets the requirements of subparagraphs (A)–(K). The paragraph does not say when the Administrator "shall disapprove" a plan or portions of a plan, although a reasonable implication of the language, and the one advanced by petitioners, might be that he "shall disapprove" when he finds that any of the listed requirements is not met.[10] The language does

---

**10.** Petitioners cite several cases which, they claim, hold that the Administrator must disapprove a plan (or portion thereof) that is deficient in any respect. They rely most heavily on *Train v. NRDC*. In that case, however, the Supreme Court "held" only that the Administrator must *approve* a plan that meets all the requirements of § 110(a)(2). 421 U.S. at 79, 95 S.Ct. at 1481–82. The one Fifth Circuit case which petitioners say has decided this issue is irrelevant. *See United States Steel Corp. v. USEPA*, 595 F.2d 207, 216 (simply paraphrasing the statutory language in dictum), *clarified*, 598 F.2d 915 (5th Cir. 1979). Petitioners' reliance on *NRDC v. EPA*, 478 F.2d 875, 888 (1st Cir. 1973), is curious, since the result reached in the part of the opinion cited was disapproved by the Supreme Court in *Train v. NRDC*, 421 U.S. at 87, 91–94, 95 S.Ct. at 1485, 1487–89. In *NRDC v. EPA*, 475 F.2d 968 (D.C. Cir.1973), the D.C. Circuit did hold that the Administrator had acted improperly in allowing several states to delay submission of the transportation control provisions required by § 110(a)(2)(B) and in granting these states extensions for attainment of the national primary standards. *Id.* at 970. In the case before us,

however, the Administrator has not given any extension for attainment of the primary standards (except that specifically authorized by § 172(a)(2), 42 U.S.C. § 7502(a)(2)), nor has he allowed Texas to delay submission of a required element of its plan. Rather, Texas has submitted a plan which includes all the provisions required, and the Administrator has simply required changes in some of the provisions submitted. Moreover, the D.C. Circuit did not order the Administrator to immediately promulgate transportation control plans; instead, the primary remedy it devised was quite like the EPA's own conditional approval policy, giving the states a short period to make additional submissions while holding the states to the attainment deadlines. *See id.* at 970–71. More to the point, we think, is *Friends of the Earth v. USEPA*, 499 F.2d 1118 (2d Cir. 1974), in which the Second Circuit upheld an EPA policy quite like "conditional approval." Although New York's transportation control plan did not contain detailed regulations, the EPA approved it on the state's assurance that more detail would be provided later. The court held:

> So long as the plan is detailed enough that the Administrator can determine that the

not expressly give the Administrator the option of "conditional approval"—finding that all the requirements are not met, but approving the plan on the condition that they will be met in the future. On the other hand, the paragraph does not expressly direct the Administrator to disapprove the plan if a requirement is not met.

One of the requirements of a plan which the Administrator "shall approve" under paragraph (2) is that

> it provide[ ] for revision . . . of such plan . . . (ii) whenever the Administrator finds on the basis of information available to him that the plan is substantially inadequate to achieve the national ambient air quality primary or secondary standard which it implements or to otherwise comply with any additional requirements established under the Clean Air Act Amendments of 1977.

CAA § 110(a)(2)(H), 42 U.S.C. § 7410(a)(2)(H). This language does not expressly grant the Administrator the power to require revisions to a plan in lieu of approval or disapproval. By its terms, subparagraph (H) does no more than specify one of the provisions to be included in a SIP. *See Train v. NRDC*, 421 U.S. at 98, 95 S.Ct. at 1490. It is not in itself a qualification of the Administrator's duty to "approve or disapprove." Nevertheless, it does imply that the Administrator has the power

to require revisions under certain circumstances.

The parties differ on whether this implied power to require revisions has any application to the approval-disapproval process. Petitioners argue that subparagraph (H) applies only when the Administrator finds that a previously approved plan is now "substantially inadequate"; the EPA argues that it also applies when the Administrator finds that a plan submitted for approval is found lacking. The language of subparagraph (H) does not expressly rule out either possibility. Moreover, the legislative history demonstrates that Congress deleted language that would have expressly limited this provision to previously approved plans.[11] If the Administrator has the implied power under subparagraph (H) to require revisions in a plan submitted for approval, the EPA argues, the Administrator may "approve" the plan on the ground that, since the plan provides for adoption of revisions when he requires them, he may assume that the state will indeed revise the plan as required.

While we hesitate to find a qualification of the duty to "approve or disapprove" in a subparagraph that simply specifies one of the many provisions which an approved plan must contain, there is more language concerning the Administrator's power to require revisions in subsection (c) of § 110. Paragraph (1) directs the Administrator to

---

proposed strategies will achieve national air quality standards and there is no reason to believe that the delay in promulgating detailed regulations would interfere with the requirement that such standards be achieved "as expeditiously as practicable," § 110(a)(2)(A)(i), we see no good reason not to allow a state some additional time to submit more specific details of their implementation plan.

*Id.* at 1124. Like the "conditional approval" policy, the policy at issue in *Friends of the Earth* required "sufficient commitment and detail" in the initial submission to ensure that the air quality standards would be attained. *Id.*

**11.** Section 110 comes from the Senate version of the 1970 statute. As reported out of committee, the section contained a provision expressly granting the Administrator the power to revise a plan whenever he found, on the basis of "any information . . . made available to him," that "an *approved or promulgated*

implementation plan will be, or has been, substantially inadequate to achieve national ambient air quality standards." S. 4358, sec. 6, § 111(e)(1), *in* S.Rep.No.1196, 91st Cong., 2d Sess. 89 (1970) (emphasis added). This provision was approved by the Senate. *See* 116 Cong.Rec. 33118–19 (1970) ("adopting" House bill, but striking everything after the enacting clause and substituting the Senate bill in its place). The conference committee moved this language from what would have been subsection (e) of § 110 to its present location at (a)(2)(H), deleting the words "approved or promulgated" in the process. *See* H.R.Conf.Rep. No.1783, 91st Cong., 2d Sess. 7 (1970). No explanation was given for this change either in the conference report, *see id.* at 45, or on the floor of Congress. It is clear, however, that Congress rejected an opportunity to restrict the revision process to "approved or promulgated" plans.

"promptly prepare and publish proposed regulations setting forth an implementation plan, or portion thereof, if—

(A) the State fails to submit an implementation plan which meets the requirements of this section,

(B) the plan, or any portion thereof, . . . is determined by the Administrator not to be in accordance with the requirements of this section, or

(C) the State fails, within 60 days after notification by the Administrator or such longer period as he may prescribe, *to revise* an implementation plan *as required pursuant to a provision* of its plan *referred to in subsection (a)(2)(H)* of this section.

CAA § 110(c)(1), 42 U.S.C. § 7410(c)(1) (emphasis added). Thus, paragraph (1) requires proposed regulations in three instances: (A) failure to submit a plan; (B) failure to submit an acceptable plan; (C) failure to revise when notified by the Administrator. The EPA argues that subparagraph (C) creates an exception to the Administrator's duty to impose an implementation plan under paragraph (1) whenever he has required the state to revise its plan. We have some difficulty with this interpretation: by its terms, subparagraph (C) is an additional command that the Administrator shall propose a plan, not an exception to the commands given in subparagraphs (A) and (B). Moreover, reading subparagraph (C) as an exception allowing the Administrator to wait until "60 days after notification . . . or [for] *such longer period as he may prescribe*" before proposing regulations would give the Administrator the power to circumvent all of the deadlines expressly prescribed by Congress in § 110.

Petitioners argue that interpreting the revision provisions of (a)(2)(H) and (c)(1)(C) as applying only to previously approved plans would be more consistent with the (a)(2) requirement that the Administrator "approve or disapprove" and with the deadlines contained in (a)(2) and (c)(1). We think that petitioners' interpretation is a reasonable one. If the EPA had adopted it, we would uphold it. The issue, however, is not whether petitioners' interpretation is

reasonable, but whether the EPA's interpretation is "plainly unreasonable." *Lead Industries Association, Inc. v. EPA*, 647 F.2d at 1147. We cannot say with any assurance that the EPA's interpretation is incorrect. While § 110 specifies when the Administrator "shall approve," it nowhere prescribes when the Administrator "shall disapprove." The section impliedly grants the Administrator authority to require revisions in SIPs, and it does not expressly rule out the use of the revision authority in the approval-disapproval process. Finally, subsection (c)(1)(C) does give the Administrator the discretion, once he has invoked his revision authority, to give a state "such longer period as he may prescribe" to make the revisions needed to bring the plan into compliance. While we certainly would not conclude that the EPA's interpretation is the only permissible reading of § 110, *see Train v. NRDC*, 421 U.S. at 75, 95 S.Ct. at 1479, we think that it does have support in the language of the statute.

Moreover, important policy considerations support the EPA's interpretation. One of the central purposes of the Clean Air Act was to place the "primary responsibility" for assuring air quality on the states. CAA § 107(a), 42 U.S.C. § 7407(a); *see Train v. NRDC*, 421 U.S. at 64–65, 79–80, 86–87, 95 S.Ct. at 1474–75, 1481–82, 1485. It would be inconsistent with this purpose to hold that the EPA must mechanically disapprove a state's SIP revisions even though the revisions "substantially comply" with the statute. This is especially so when the statutory language gives at best uncertain guidance as to precisely what it required. In these circumstances, we find it unlikely that Congress intended the imposition of a federal plan to be preferred to a commitment by the state to make the needed modifications.

Furthermore, we think that the EPA's interpretation gives the agency a minimal amount of needed flexibility in enforcing the statutory deadlines. Under petitioners' reading of § 110, if the state timely performed its duty by submitting its revisions on January 1, and the EPA timely performed its duty of disapproving the plan on

May 1, the Administrator would have two months to prepare and publish a proposed implementation plan, give the public an adequate opportunity for comment and consider all comment received,[12] arrange, give notice of, and hold a public hearing on the plan it has proposed,[13] and promulgate the final plan. CAA § 110(c)(1), 42 U.S.C. § 7410(c)(1). While we believe that Congress intended the deadlines to be enforced, we do not think that Congress ruled out the possibility that SIP revisions submitted before the final deadline of July 1, 1979, could be "conditionally approved" if they were in substantial compliance with the Act's requirements. *See Friends of the Earth v. USEPA*, 499 F.2d 1118, 1124 (2d Cir. 1974) (Administrator could fully approve SIP and give state additional time to provide needed details so long as state gave adequate commitment and detail to ensure attainment of air quality standards).

In sum, we think that the EPA reasonably concluded that conditional approval was consistent with the Act. The "heart" of the 1977 Amendments is that the SIP revisions "shall provide for attainment of each . . . national ambient air quality standard in each [nonattainment] area as expeditiously as practicable, but, in the case of national primary ambient air quality standards, not later than December 31, 1982," CAA § 172(a)(1), 42 U.S.C. § 7502(a)(1). *Cf. Train v. NRDC*, 421 U.S. at 66–67, 95 S.Ct. at 1475 (discussing 1970 Amendments). "Conditional approval" is neither an exemption from this condition nor an extension of

the statute's deadlines; instead, it is a conclusion that, if minor changes are made, the statute's principal condition and deadlines will be met. When the statute's ultimate goal can be met as well by state "revision" as by EPA "promulgation," we think that the EPA can reasonably choose to employ the former; after all, it is not "promulgation" of a plan that will clean the air, but state implementation of whatever plan is devised.[14]

Accordingly, we hold that the EPA's conditional approval policy was a reasonable interpretation of the statute.

*C. Propriety of Granting Conditional Approval to the Texas SIP Revisions*

■ Petitioners argue that, even if conditional approval is permissible under § 110, it should not have been granted to the Texas SIP revisions. First, petitioners point out that the conditional approval was not granted until March 25, 1980. They argue that the EPA should not be able to invoke the exception created by § 110(c)(1)(C) after expiration of the July 1, 1979 deadline for promulgation of an implementation plan otherwise imposed by § 110(c)(1).

Section 110(c)(1) requires the Administrator to promulgate an implementation plan or revision "unless, prior to such promulgation, such state *has adopted* and *submitted* a plan (or *revision*) *which the Administrator determines* to be in accordance with the requirements of this section." 42 U.S.C. § 7410(c)(1) (emphasis added). The use of

---

12. *See United States Steel Corp. v. USEPA*, 595 F.2d 207, 213–14 (5th Cir. 1979) (holding, in effect, that EPA must follow APA procedures, even if violation of statutory deadlines results), *clarified on other grounds*, 598 F.2d 915 (5th Cir. 1979).

13. Section 110(c)(1) provides that, if the state "held no public hearing associated with respect to [the] plan (or revision thereof), the Administrator shall provide opportunity for such hearing within such State on any proposed regulation." 42 U.S.C. § 7410(c)(1). While the statute does not expressly require the Administrator to hold a hearing if the state has held one, and therefore a court could not order one to be held, *see Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 524, 98 S.Ct. 1197, 1202, 55 L.Ed.2d 460 (1978), fairness

would seem to require the agency to hold a public hearing if the Administrator's proposal bore little resemblance to the state's proposal.

14. We think that this reality militates with even greater force against a court order to promulgate a plan at this time, when all of the dates for fulfilling the conditions have passed, *see* 44 Fed.Reg. 45204 (1979), and when the EPA is in the process of granting full approval to the conditionally approved portions of the state's plan, *see* 46 Fed.Reg. 35642 (July 10, 1981) (granting full approval to certain conditionally approved parts of plan); 46 Fed.Reg. 30366, 30367 (June 8, 1981) (proposing full approval of the plan provisions concerning total suspended particulate, discussed in section III.E. *infra*).

the words "has adopted and submitted" make clear that the state must adopt and submit the plan or revision before the promulgation deadline; the tense of the word "determines" indicates that the Administrator need not make his determination by the same deadline. Congress' use of different tenses can be interpreted as a recognition that the Administrator would need a reasonable time to pass on the state's submission.

Texas did "adopt and submit" its SIP revisions on April 13, 1979, before the July 1 deadline (*i. e.*, six months after the state plan was due on January 1). On August 1, only one month after the deadline, the Administrator proposed conditional approval. Additional time was needed to work out the final conditions and schedule after notice and comment had been received. Petitioner has not shown that the time taken was unreasonable.

As we have explained above, conditional approval is in essence a determination that the requirements of the statute have been met. Therefore, the state did "adopt and submit" a SIP revision which the Administrator determined, within a reasonable period, to be in accordance with the statutory requirements. The EPA's failure to promulgate Part D revisions for the state did not violate § 110.

Petitioners also argue that the Texas plan revisions did not satisfy the EPA's own criteria for conditional approval because the deficiencies were not "minor" and they were not required to be corrected within a "short" time. *See* 44 Fed.Reg. 38583 (1979). Petitioners' contention that the deficiencies were not minor rests on their challenges to the substance of many portions of the state's plan; since we devote the remainder of this opinion to rejecting those challenges, we think the EPA reasonably concluded that the deficiencies were minor. We also think that the state committed itself to making corrections within a reasonably

"short" time: in its March 25, 1980 notice the EPA gave the state until August 1, 1980, to fulfill most of the conditions the agency set. Petitioners have not shown that this period was not "short"; they have not argued, for example, that the amount of time given would prevent the plan from providing for attainment of the air quality standards within the statutory deadlines.

Accordingly, we uphold the Administrator's grant of conditional approval to portions of the state's Part D revisions.

### III. Challenges to the Substance of the Texas Part D Revisions

#### A. Scope of Review

We are met at the outset by two unsupported contentions concerning the scope of our review. Petitioners say that we should apply the standard of review applicable to agency adjudication, and set aside the EPA's determinations if they are not supported by substantial evidence in the record. *See* 5 U.S.C. §§ 554, 556, 557, 706(2)(E). The respondents also adopt the adjudicatory theme, arguing that petitioners should not be permitted to raise on appeal any argument that was not raised during the "notice and comment" period.

The source of both contentions is the type of action taken by the agency in this case. The Administrator's determinations concerning implementation plans are designated as "rules" by the statute and the agency, and the procedures employed in their formulation are the rulemaking procedures of the Administrative Procedure Act ("APA"). *See* 5 U.S.C. § 553.[15] The rulemaking procedure is appropriate since the formulation of an implementation plan is in large part a legislative, policy-making task, committed in the first instance to the state and disapproved by the EPA only if it fails to meet the statutory requirements, *see Train v. NRDC*, 421 U.S. at 65, 79, 95 S.Ct. at 1475, 1482; *Florida Power & Light Co. v. Costle,*

---

**15.** We note that in the 1977 Amendments, Congress removed much of the EPA's rulemaking from the provisions of the APA by adding a new subsection (d) to § 307. Pub.L.No.95–95 § 305(a), 91 Stat. 685 (codified at 42 U.S.C. § 7607(d)). The statutory language and its leg-

islative history make clear, however, that § 307(d) does not apply to the approval or disapproval of implementation plans. *See* H.R. Conf.Rep.No.564, 95th Cong., 1st Sess. 177 (1977). Thus, the approval process remains under the APA procedures.

650 F.2d 579, 581 (5th Cir. 1981). In deciding whether a particular state's plan satisfies the statutory requirements, however, the EPA must at many points make factual determinations.

Despite these factual components, neither the Supreme Court nor this court has abandoned the "arbitrary or capricious" standard of review; both have rejected the "substantial evidence" rule, primarily because the agency's procedures are "not designed to produce a record that is to be the basis of" the factual determinations. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971), *followed in Texas v. EPA*, 499 F.2d 289, 296 & n.7 (5th Cir. 1974) (review of EPA action on original Texas SIP), *cert. denied*, 427 U.S. 905, 96 S.Ct. 3191, 49 L.Ed.2d 1199 (1976). At the same time, however, the courts have begun to realize that they sometimes cannot say whether a factual determination is "arbitrary or capricious" unless they know the basis for the facts found. *See Overton Park*, 401 U.S. at 416, 91 S.Ct. at 824 (court's "inquiry into the facts is to be searching and careful"); *id.* at 420, 91 S.Ct. at 825–26 (suggesting that an inquiry into decisionmakers' mental processes may be appropriate when facts relied on are not in the agency record); *Texas v. EPA*, 499 F.2d at 297 ("Only by our own study of the record can we resolve the factual disputes between the parties ...."); 1 K. Davis, Administrative Law § 6:13 (2d ed. 1978).

Despite their recognition of the concept that, to be reasonable, a factual determination must have evidence to substantiate it, the courts have had difficulties applying the concept to "informal" agency action. These difficulties relate primarily to the nature of the decisions made and the records on which they are made. The difficulties are particularly acute in this case. First, is hard to separate the "factual" components of the SIP-approval process from its "policy-making" components.[16] *Cf.* 1 K. Davis, *supra*, § 6:13, at 510 ("The problem area ... is the area in which facts and policy thinking are mixed together in such a way that the factual ingredient of the rules is hard to identify."). Moreover, the ultimate question to be resolved by the agency—whether the plan submitted will "provide for" attainment of the national standards by specified future dates, *see* CAA §§ 110(a)(1), 172(a)(1), 42 U.S.C. §§ 7410(a)(1), 7502(a)(1)—is one which cannot be substantiated by proof positive, but is inherently a predictive one. *Cf. FCC v. National Citizens Committee for Broadcasting*, 436 U.S. 775, 814, 98 S.Ct. 2096, 2121, 56 L.Ed.2d 697 (1978) (when rule is based in part on a prediction "complete factual support ... is not possible or required").

Our second difficulty is the record of the Part D revision process. It consists mainly of documents exchanged by the state and the EPA which, in essence, state the baseline levels of air pollution, project increases in air pollution if the problems are left uncontrolled, predict reductions if certain measures are taken, and then compare the final levels calculated with the national standards the EPA has promulgated. All of this material is based on many previous decisions of the EPA concerning the state's original implementation plan, the "reasonable availability" of various techniques, the validity of certain computer models and mathematical computations, and the reliability of the data used in the computations. Few if any of the decisions and assumptions underlying the SIP's predictions are contained or explained in the record.

■ Against this background, we are presented, in one of petitioners' many points of error, with a laundry list of the requirements of § 172, 42 U.S.C. § 7502, each accompanied by the naked assertion that there is no evidence to support the agency's conclusion that the requirement has been met. Petitioners have not even specified what facts they believe the agency was required to find. Thus, without any

---

16. For example, § 172(b)(2) requires that a Part D revision "provide for implementation of all reasonably available control measures as expeditiously as practicable." 42 U.S.C. § 7502(b)(2). Is what is *reasonably* available" a factual determination or a policy choice? Or does the determination have both factual and policy elements?

specific objection to the agency's determination, petitioners would put the agency and the court to the arduous task of explaining every step in a decade-spanning, technical and complicated decisional process. We think that petitioners must do more than this to merit review of their contentions. *Cf. Citizens for a Better Environment v. USEPA*, 649 F.2d 522, 529 (7th Cir. 1981) (when petitioners claim that all "reasonably available control measures" have not been implemented without identifying the measures not implemented, their challenge amounts to "paper pleadings").

Without rejecting the possible applicability of the principle that evidence must substantiate the factual components of "informal" agency action, we reaffirm that the basic standard of review is the "arbitrary or capricious" standard. *See Texas v. EPA*, 499 F.2d at 296. Accordingly, petitioners must at least articulate some reason why the agency's actions may be arbitrary or capricious. *See Alabama Nursing Home Association v. Harris*, 617 F.2d 388, 393 (5th Cir. 1980) (agency action is presumed valid, and petitioners have the burden of showing the agency's error). When petitioners claim that an agency conclusion was arbitrary because there was no evidence to support it, they must at least identify the factual determination the agency was required to make and their basis for disputing it, bringing the countervailing evidence, if any, to the attention of the court. *See Texas v. EPA*, 499 F.2d at 297 (court must generally restrict itself to parties' references to the record). When the parties have identified a legitimate factual dispute that cannot be resolved by the court on the rulemaking record, they may be permitted to supplement the bare record with background information and explanations of methodology which, often from practical necessity, are not included in the particular rulemaking file. *See Overton Park*, 401 U.S. at 420, 91 S.Ct. at 825 (dictum); *Texas v. EPA*, 499 F.2d at 319 (allowing explanatory documents into the record). But petitioners cannot expect the reviewing court to identify the factual disputes for them.

Accordingly, we have limited our review of petitioners' conclusory assertions that there is "no evidence" that the requirements of § 172 have been met to determining that the agency did indeed conclude that the requirements were met. In the sections that follow we give fuller review to petitioners' specific objections to the EPA's actions.

■ Just as we cannot fully accept petitioners' adjudicatory analogy, we cannot accept the EPA's argument that petitioners should be barred from raising any objection not raised during the "notice and comment" period. The EPA made the same argument in a case it has failed to cite to us, and the argument was rejected by Judge Hill, then a district judge. *Dobbs v. Train*, 409 F.Supp. 432, 434–35 (N.D.Ga.1975), *aff'd sub nom. Dobbs v. Costle*, 559 F.2d 946 (5th Cir. 1977). While *Dobbs* was an action to review an agency denial of benefits pursuant to the challenged rule, and this action is one for direct review, we agree with Judge Hill that the courts should not generally hold a petitioner estopped from objecting to an agency rule because his specific objection was not made during the "notice and comment" period.[17] The rule urged by EPA would require everyone who wishes to

---

**17.** The EPA has cited no authority for the proposition that an argument not raised during the comment period may not be raised on review. The agency's reliance on *United States v. L. A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 73 S.Ct. 67, 97 L.Ed. 54 (1952), and *Merchants Fast Motor Lines, Inc. v. ICC*, 528 F.2d 1042 (5th Cir. 1976), is badly misplaced. Each case involved a challenge to ICC action by a party who participated in a hearing at which evidence was taken and findings were made on the record, and who had an opportunity to appeal the hearing officer's decision to the Commission itself.

Our own research has uncovered one case lending some support to the proposition that a party may be estopped from raising an argument on direct review if he failed to raise it during the rulemaking proceeding. *Gage v. AEC*, 479 F.2d 1214, 1217–19 (D.C.Cir.1973). *Gage*, however, involved a statute entitling interested persons to become "parties" and get a "hearing" on their objections, and granting the right of direct review only to such "parties." In the case before us, there are no comparable statutory provisions or limitations. *See* note 19 *infra*.

protect himself from arbitrary agency action not only to become a faithful reader of the notices of proposed rulemaking published each day in the *Federal Register*, but a psychic able to predict the possible changes that could be made in the proposal when the rule is finally promulgated.[18] This is a fate this court will impose on no one.[19]

The nature of petitioners' objections make this a particularly inappropriate case for estoppel. Petitioners claim that the EPA improperly determined that various requirements of the statute were met. Since the EPA is required by statute to make these determinations in approving or disapproving a state plan, we do not think that petitioners needed to notify the agency that it had acted arbitrarily. The statute gave it sufficient notice that it must make reasoned determinations.[20]

Having determined the scope of our review, we turn to petitioners' specific objections to the EPA's actions.

### B. *Alternatives Analysis*

Section 172 of the Act, 42 U.S.C. § 7502, lists the provisions required in every nonattainment plan. That section also contains several special provisions that must be included for any nonattainment area which, like Harris County, cannot meet the primary standards for certain pollutants by December 31, 1982, and receives an extension for attaining them up to December 31, 1987. The section provides that such a plan

> shall ... establish a program which requires, prior to issuance of any permit for construction or modification of a major emitting facility, an analysis of alternative sites, sizes, production processes, and environmental control techniques for such proposed source which demonstrates that benefits of the proposed source signifi-

cantly outweigh the environmental and social costs imposed as a result of its location, construction, or modification[.] CAA § 172(b)(11)(A), 42 U.S.C. § 7502(b)(11)(A). Petitioners point out that the only provision in the Texas plan that purports to satisfy this requirement simply states that the TACB's construction permit application form "is being amended to require the applicant to respond as to whether or not an alternate site analysis has been performed." Petitioners argue that this provision does not comply with the statute because it does not "require" any analysis at all: there is no provision for informing the applicant of what the "analysis" is or what it requires; there is no provision indicating that the state will review the applicant's analysis to ensure, for example, that it does indeed "demonstrate that benefits of the proposed source significantly outweigh [its] environmental and social costs"; there is no provision even indicating that a negative answer to the proposed question will result in rejection of the application. Therefore, petitioners contend, the proposed "check-off box" is not even a "program," much less a program that satisfies the requirements of the statute.

The EPA fully approved this portion of the SIP after the TACB "ha[d] provided a written commitment to inform applicants who do not perform the required analyses that a permit meeting federal requirements cannot be issued." 45 Fed.Reg. 19231, 19232–33 (1980). While this "commitment" leaves the SIP with no indication of what sort of analysis is required, it does establish a basis for the EPA to believe that something would be required. The EPA argues that the details of this "something" are unimportant: it argues that § 172(a)(2) re-

18. A petitioner generally has no right to demand an additional period for comments when the rule promulgated differs from the rule proposed as a result of comments tendered during the rulemaking proceeding. *See* 1 K. Davis, *supra*, § 6:25, at 574–76 (summarizing cases).

19. We note that Congress has attempted to impose such a fate, albeit with some escape clauses, in § 307(d)(7)(B) of the Clean Air Act, 42 U.S.C. § 7607(d)(7)(B). The EPA concedes, however, that § 307(d) does not apply to the

approval or disapproval of implementation plans. *See* note 15 *supra*.

20. Moreover, we find many of the EPA's claims that it was unaware of petitioners' objections to be disingenuous. It is clear that the EPA was aware of the legal delicacy of its conditional approval policy, and any claim that the agency was not "aware" that the statute passed by Texas might not provide legal authority to implement an inspection and maintenance program, *see* section III.C. *infra*, rings false.

quires only that it determine that the provisions of the plan "provide for the attainment of the national primary standard for the pollutant (or pollutants) with respect to which [an extension is given] as expeditiously as practicable but not later than December 31, 1987." 42 U.S.C. § 7502(a)(2). As long as it makes this determination, the EPA argues, the details of the "program" required by subsection (b)(11)(A), 42 U.S.C. § 7502(b)(11)(A), are unimportant.

We hesitate to accept the EPA's argument in full: while we agree that the Act generally leaves the states with considerable latitude in determining how its requirements will be met, *see Train v. NRDC, Inc.*, 421 U.S. at 87, 95 S.Ct. at 1485, and that therefore there is no inflexible "alternatives analysis program" imposed by § 172(b)(11)(A), we assume that when Congress outlined the general elements and purpose of such a program, it intended the states to establish programs which incorporated those elements and achieved that purpose. When Congress required the "alternatives analysis program" to be part of any plan which received an extension under subsection (a)(2), it undoubtedly intended that such a program would have to be part of the plan if the state was to demonstrate that it could not meet the statutory deadlines "despite the implementation of *all* reasonably available measures" but that it had nevertheless come up with a plan that would attain the primary standards "as expeditiously as practicable." 42 U.S.C. § 7502(a)(2) (emphasis added). Thus, we must determine whether the state has established some program that provides for the sort of alternatives analysis described by the statute.

The analysis required by the statute must "demonstrate[ ] that benefits of the proposed source significantly outweigh [its] environmental and social costs." The statute does not indicate what sort of "benefits" should be considered, but obviously the benefits must be economic and social ones: con-

struction of a "major emitting facility" will rarely result in environmental benefits. The Act, however, gives no indication of how economic and social benefits may be compared to environmental and social costs.

The state of Texas argues that it has a program of analysis that essentially satisfies the requirements of (b)(11)(A): under the Texas Clean Air Act, a permit applicant must demonstrate to the TACB that its proposed facility will not "contravene the intent of the Texas Clean Air Act" or the standards established by § 3.27 of the Act. Tex.Rev.Civ.Stat.Ann. art. 4477–5, § 3.27(c) (Vernon's Supp. 1981). This procedure, the state argues, requires a demonstration that the proposed facility will not impose unacceptable environmental costs without "diluting" the inquiry by permitting consideration of economic benefits. Furthermore, the state points out, its rules do not simply require an "analysis" of "alternative . . . environmental control techniques"; they require sources subject to (b)(11)(A) to achieve the "lowest achievable emission rate." [21] As for the required "analysis" of "alternative sites, sizes, and production processes," the state argues that its assurances to the EPA concerning "enforcement" of the application form requirement, combined with its existing application program, are enough to satisfy (b)(11)(A)'s broad requirements.

█ While we find it difficult to say that the components of the Texas program correspond precisely to the terms of the statute, we find it equally difficult to say that the demonstration that Texas requires of permit applicants does not meet the essential concerns of (b)(11)(A). Since Texas has committed not to issue "permit[s] meeting federal requirements" if the alternative analysis is not done, and since operation of a new facility without such a permit would violate the implementation plan, *see* § 172(b)(6), 42 U.S.C. § 7502(b)(6), the EPA would be able to bring an enforcement ac-

---

**21.** This requirement is not one of the state's own devise, but is instead required by another section of Part D itself. CAA § 173(2), 42 U.S.C. § 7503(2). Nevertheless, the requirement that the permit applicant demonstrate

compliance with the lowest achievable emission rate inherently requires an analysis of alternative control techniques. *See* CAA § 171(3), 42 U.S.C. § 7501(3) (defining "lowest achievable emission rate").

tion against the owner or operator of such a facility. *See* CAA § 113, 42 U.S.C. § 7413. Moreover, if the EPA should in the future give a more definitive interpretation of the alternative analysis program required by § 172(b)(11)(B), it may require Texas to revise its SIP. *See* CAA §§ 178, 108(c), 110(a)(2)(H)(ii), 42 U.S.C. §§ 7508, 7408(c), 7410(a)(2)(H)(ii). If we were to set aside the alternatives analysis portion of the Texas plan, it would be simply because we have played a match game with paper terms and found a few terms missing. The EPA has determined that the Texas alternatives program is sufficient and, more importantly, that the entire Texas plan is sufficient to attain the primary standards "as expeditiously as practicable." Because Texas does have a program requiring a demonstration concerning a proposed facility's environmental costs, and because Texas has assured the EPA that the state will inform any applicant who does not perform the required analysis that its operation will not be in compliance with the Clean Air Act, we cannot say that the EPA's approval of the state's alternatives analysis program was arbitrary, capricious, or an abuse of discretion.

## C. *Inspection and Maintenance Program*

Petitioners challenge the EPA's full approval of the provisions in the Texas SIP for an automobile inspection and maintenance program in Harris County. 45 Fed. Reg. 74830 (1979). These provisions became necessary when the state asked for and received an extension for attainment of the ozone standard in Harris County past the December 31, 1982 deadline. *See* CAA § 172(a)(2), (b)(11), 42 U.S.C. § 7502(a)(2), (b)(11). The provisions were included pursuant to § 172(b)(11)(B), which requires that

the plan provisions . . . shall . . . establish a specific schedule for implementation of a vehicle emission control inspection and maintenance program[.]

42 U.S.C. § 7502(b)(11)(B). The arguments of the parties reflect confusion and disagreement concerning exactly what (b)(11)(B) requires, without any attempt to squarely address the issue.

The petitioners assert that, when read together with the § 172 requirements (1) that the state demonstrate that it has "*implement[ed]* . . . all reasonably available measures*" and that it has provided for attainment of the primary standards "as expeditiously as practicable," 42 U.S.C. § 7502(a)(2) (emphasis added), and (2) that the plan "include written evidence" that the legislature has adopted the "necessary . . . schedules" and that the state is "committed to *implement* and *enforce* the appropriate elements of the plan," *id.* § 7502(b)(10) (emphasis added), the language of (b)(11)(B) must require that the state submit evidence that the legislature has adopted a law which *implements* mandatory inspection and maintenance programs. Intervenor Texas disagrees, arguing that (b)(11)(B), by its very terms, requires no more than a "*schedule* for implementation of a . . . program." The statute says nothing about the nature of the program to be scheduled, and does not expressly require the program to be mandatory. In its brief, the EPA apparently[22] adopts petitioners' interpretation of the statutory requirements, but argues that legislation adopted by the state provides adequate authority to implement a mandatory inspection and maintenance program.

The EPA's position concerning the Texas legislation is untenable. While the Texas statute does direct the TACB to devise a "schedule" for implementation of an inspection and maintenance program, it does not authorize the TACB, or anyone else, to implement the schedule devised. Furthermore, the Texas legislation does not require the program "scheduled" to be mandatory.[23]

**22.** We say "apparently" because the EPA does its best not to articulate any clear position on the issue.

**23.** *See* Tex.Rev.Civ.Stat.Ann. art. 4477–5, § 3.30(d) (Vernon's Supp. 1981). The EPA assumes that, unless the Texas legislature takes

further action to "amend" the statute, the schedule devised by the TACB will go into effect. There is simply no basis for this assumption in the statute. Moreover, the state itself does not endorse the EPA's interpretation.

Thus, if we accepted the interpretation of § 172(b)(11)(B) adopted by the EPA in its brief, we would hold the agency's approval of the inspection and maintenance portion of the SIP revisions to be arbitrary and capricious. The interests of intervenor Texas, however, are also at stake in this action. Indeed, the relief requested by petitioners—an order that the Texas plan be disapproved and an inspection and maintenance program imposed upon the state—would affect the state most directly. Because we are not at all sure what the statute requires, and because we believe the EPA has never given an unambiguous interpretation of it, we take an independent look at the statute and its legislative history.

The statute, by its terms, requires nothing more than a schedule. While we agree that Congress must have intended something more than a hypothetical inspection and maintenance program, we also believe that Congress did not intend § 172(b)(11)(B) to be a self-executing requirement that the state implement an inspection and maintenance program; indeed, in passing the 1977 Amendments, Congress rejected such a provision.[24] Instead, we think that Congress used the word "schedule" for a specific purpose: it intended the statutory language itself to require only that the revisions submitted prior to 1979 establish a "schedule," in order to give the state sufficient lead time prior to implementation of the program. It intended an enforceable program to be put in place by additional SIP revisions required to be submitted in 1982. The 1977 Amendments require any state that receives an extension pursuant to § 172(a)(2) to "adopt and submit to the Administrator a plan revision before July 1, 1982." Pub.L.No.95–95 § 129(c), 91 Stat. 685 *as amended by* Pub.L.No.95–190 § 14(b)(4), 91 Stat. 1393 (see note under 42 U.S.C. § 7502). This revision must "contain

*enforceable* measures to assure attainment of the applicable standard not later than December 31, 1987." CAA ·§ 172(c), 42 U.S.C. § 7502(c) (emphasis added). If Congress had intended the state's 1979 submission to contain an enforceable inspection and maintenance program, then the provision for an additional submission containing "enforceable measures" in 1982 would have been unnecessary.

■ We think that the deferment of submission of "enforceable" measures until July 1,. 1982, combined with the requirement of only a "schedule" in the 1979 submission, indicates congressional recognition that a state might not have been able to devise, and therefore might not have been able to authorize the implementation of, an inspection and maintenance program by July 1, 1979. This recognition is reflected in the legislative history. Section 172 comes from the Senate version of the 1977 Amendments. *See* S.Rep.No.127, 95th Cong., 1st Sess. 154–56 (1977) (originally designated as § 110(h)(1)–(3)). In discussing the requirements of § 172, the committee does clearly state that an inspection and maintenance program "is a precondition for extensions of deadlines for attainment of oxidant and carbon monoxide standards beyond 1982." *Id.* at 40. The committee also makes clear, however, that the 1979 and 1982 submissions serve different purposes:

> The bill requires that plans submitted by January 1, 1979, must provide for implementation of all *reasonably available* control measures as quickly as possible. States with regions in which reasonable measures will not provide for attainment of a standard by July 1, 1982, must *identify* in the 1979 plan submission additional measures *which would be needed* to attain standards no later than July 1, 1987. The additional measures identified

**24.** The House version of the 1977 Amendments, as reported out of committee, required a mandatory inspection and maintenance program in areas, such as Harris County, that were exceeding the national primary standards for carbon monoxide or ozone. *See* H.R.Rep.No.294, 95th Cong., 1st Sess. 20–21, 281–91, *reprinted in* [1977] U.S. Code Cong. & Ad. News 1077, 1098,

1360–70. The provision of the House bill requiring mandatory inspection and maintenance, however, was not adopted by Congress. We find it rather curious that the only legislative history the EPA relies on for its interpretation of § 172(b)(11)(B) in this litigation is the House Report's discussion of this unenacted provision. *See* Brief for Respondent at 4.

may not be deemed reasonable, and the State *need not make a commitment at the time the plan is submitted* to implement them. For example, gas rationing may be identified as ultimately necessary to attain standards, but this is not currently a reasonable measure.

*Id.* at 39 (emphasis added). Thus, in the 1979 submission, the state need only commit to implementing "reasonably available" measures. The committee goes on to describe such measures:

> In determining whether a measure is reasonable, a State or the Administrator must consider the time provided for implementation. For example, a vehicle inspection and maintenance program *may not be reasonably available by mid-1978 or 1979.* There may be a need for lead time to train mechanics, build facilities and educate the public. The program would, however, be reasonable if sufficient lead time is allowed to phase it in. The bill makes clear that an inspection and maintenance program is a reasonable measure.

*Id.* at 40 (emphasis added). Reading the words of the statute along with this legislative history leads us to conclude that Congress did not intend to require an "enforceable" inspection and maintenance program until the 1982 submission unless, prior to that time, the EPA had determined that the implementation of such a program was a "reasonably available" measure.

The EPA, to our knowledge, has never made an unambiguous determination that an inspection and maintenance program is a "reasonably available" measure, either generally or in the state of Texas. Petitioners and the EPA cite two policy statements issued by the agency in which, they say, the agency has interpreted § 172 as requiring

each state to submit legislation with its 1979 Part D revisions, not merely scheduling the implementation of a program in nonattainment areas, but actually implementing a mandatory program of inspection and maintenance. *See* 43 Fed.Reg. 21673, 21676 (1978) ("Criteria for Proposing Approval of Revision to Plans for Nonattainment"); 44 Fed.Reg. 20372 (1979) ("General Preamble for Proposed Rulemaking on Approval of Plan Revisions for Nonattainment Areas"). We find these policy statements rather ambiguous. When the EPA has specified in the policy statements precisely what sort of legislative approval is required to accompany the 1979 SIP revisions, it has consistently stated that the legislation must authorize an "inspection/maintenance program *or a schedule* endorsed by and committed to by the Governor for the development, adoption, and implementation of such a program as expeditiously as practicable." 43 Fed.Reg. at 21675; *see* 44 Fed.Reg. at 20375. Only in a supplementary comment to the 1979 policy statement did the EPA opine that the SIP revisions must be accompanied by legislation actually implementing a mandatory program.[25] Moreover, these policy statements are not rules adopted in accordance with administrative rulemaking procedure; they are merely "interpretative rules" or "general statements of policy." *See* 5 U.S.C. § 553. We have some doubt whether a single comment in a somewhat inconsistent policy statement would be legally binding if the EPA rejected the state's SIP revision for failure to comply with that one statement. *Cf. Morton v. Ruiz*, 415 U.S. 199, 236–37, 94 S.Ct. 1055, 1075, 39 L.Ed.2d 270 (1974) (interpretive rule has no binding effect and is entitled to no deference when inconsistent with statutory intent).

---

**25.** In a section following the "Basic Requirements" section of the 1979 notice, *see* 44 Fed. Reg. at 20374–75, entitled "Further Guidance," the EPA does state that

> the SIP must contain a commitment of the state, local government, or regional agency to implement the program as expeditiously as practicable. EPA has determined that the final deadline for submitting assurances of *adequate legal authority to carry out* the program is June 30, 1979 .... Failure to submit

> by the required deadlines the legal authority and all regulatory requirements necessary for *mandatory* inspection and *mandatory* repair of failed vehicles will make the SIP no longer adequate to satisfy the requirements of Part D.

*Id.* at 20377 (emphasis added). Even this section is ambiguous, however, for it begins with the statement that the requirement is "[a]n acceptable inspection/maintenance program *or schedule.*" *Id.*

In the absence of a clear statement from the EPA finding that inspection and maintenance is now "reasonably available," we prefer to read § 172(b)(10), (b)(11)(B), and (c) as they are written until the EPA provides a definitive rule. Together, (b)(10) and (b)(11)(B) require written evidence that the legislature has provided the legal authority to "establish a specific schedule for implementation" of an inspection and maintenance program. The state has provided such evidence.[26] Subsection (c) requires an enforceable program to be provided in the 1982 submission. If the EPA should, before that time, clearly determine that inspection and maintenance is "reasonably available," and that therefore the state's Part D revisions must include enabling legislation providing for immediate implementation of a program, it can, of course, inform the state of Texas that its SIP and its statute must be revised. *See* CAA § 110(a)(2)(H)(ii), (c)(1)(C), 42 U.S.C. § 7410(a)(2)(H)(ii), (c)(1)(C). In comparing the legislation Texas has passed and submitted in its 1979 revisions with the requirements of (b)(11)(B), however, we cannot say that the EPA's approval of the 1979 submission was arbitrary, capricious, or an abuse of discretion. Given the statutory language and the EPA's failure to determine that inspection and maintenance was "reasonably available," we think that such approval may have been required by the statute.

### D. *The Urban/Rural Ozone Nonattainment Distinction*

In formulating the general criteria to be applied to all Part D SIPs, the EPA decided that "[a]lthough an ozone SIP must assure reasonable further progress and attainment in all nonattainment areas, the SIP need not include a specific demonstration of reasonable further progress and attainment in rural areas." 44 Fed.Reg. 20372, 20376 (1979). Instead, the agency decided, the SIP need only require the application of "reasonably available control technology" to all major sources of "volatile organic compounds" (VOC) in rural areas. The EPA reasoned that such controls, combined with specific demonstrations of attainment in urban areas, "should assure reasonable further progress and attainment in the rural areas by minimizing the pollutants transported from urbanized to rural areas." *Id.*

Petitioners argue that this exemption of rural areas from a specific demonstration of attainment contravenes the terms of Part D. The statute, however, does not expressly require a "demonstration of attainment" for each area; it requires only that "the provisions of [the] plan . . . shall *provide for* attainment . . . in each [nonattainment] area." CAA § 172(a)(1), 42 U.S.C. § 7502(a)(1); *see* CAA § 110(a)(1), 42 U.S.C. § 7410(a)(1). If the EPA could reasonably determine that the controls it required for rural areas, along with the required demonstrations for urban areas, would "provide for" attainment, then its "exemption" was a proper interpretation of the Act.

The EPA's conclusion that ozone is primarily an urban problem is based on the chemical processes resulting in the formation of ozone. Ozone is created by a series of chemical reactions between "oxidant precursors" in the presence of sunlight. Final Rulemaking on National Standards for Photochemical Oxidants, 44 Fed.Reg. 8202, 8202 (1979). The two principal precursors are VOC and nitrogen oxides ($NO_x$). *Id.* Studies have shown that ambient $NO_x$ is frequently below detectable levels in rural areas. Moreover, once it is formed, ozone can travel hundreds of miles. Thus, the EPA has concluded that the ozone present in rural areas often has its origins in urban areas. Attainment of the ozone standards in urban areas, the agency believes, will assure attainment in rural areas, especially if rural sources of VOC are adequately controlled.

---

**26.** The Texas legislation directs the TACB to conduct a pilot program in Harris County, Tex. Rev.Civ.Stat.Ann. art. 4477–5, § 3.30(b) (Vernon's Supp. 1981), and, based on the results of the pilot program, to establish a schedule "to allow and achieve full implementation of [an] inspection and maintenance program as it affects passenger vehicles in Harris County not later than December 31, 1982," *id.* § 3.30(d)(1).

We cannot say that the EPA's policy of distinguishing rural areas from urban areas is contrary to the statute or is arbitrary, capricious, or an abuse of discretion.[27]

### E. Total Suspended Particulate Matter (TSP)

In passing on the provisions of the Texas SIP dealing with Total Suspended Particulate (TSP), the EPA divided Texas into two sets of nonattainment areas. For one set, the EPA granted full approval to the TSP control measures proposed by the SIP; the approval was based on the state's commitment to implement revisions in the TACB's "Regulation I" to control "fugitive dust emissions." For the other set of nonattainment areas, the EPA granted approval conditioned on the state's adherence to a schedule to make further revisions to Regulation I to provide adequate controls for other "nontraditional sources" of TSP; in the interim, the approved Regulation I was to apply to these areas as well. 45 Fed.Reg. at 19234.

Petitioners claim that, despite the state's revisions to Regulation I and the state's commitment to revise it further, the SIP does not contain "enforceable measures" to ensure attainment of the TSP standards. They point out that, although the revisions in Regulation I are designed to control fugitive dust emissions by prohibiting use of certain roads unless the roads are oiled or paved, the plan does not specify who is to do the oiling or paving.

We do not think the EPA's approval and conditional approval of the TSP portions of the SIP were arbitrary or capricious. The EPA determined that implementation of the revisions to Regulation I would enable the state to satisfy the TSP standards; petitioners have given us no reason to question the propriety of this conclusion. We think that the agency was entitled to assume that the TACB would enforce its regulations. *See Friends of the Earth v. USE-PA*, 499 F.2d 1118, 1124 (2d Cir. 1974) (EPA could assume state would implement plan despite absence of detail). If the TACB fails to do so, then either the EPA or a concerned citizen may bring an enforcement action. *See* 42 U.S.C. §§ 7413(a)(2), 7604(a); *Friends of the Earth v. Carey*, 552 F.2d 25 (2d Cir.) (citizen suit), *cert. denied*, 434 U.S. 902, 98 S.Ct. 296, 54 L.Ed.2d 188 (1977). The only issue before us now is the sufficiency of the SIP on its face; and since petitioners have given us no ground for finding the TSP provisions insufficient, we cannot hold that the EPA's actions were arbitrary or capricious.[28]

### F. New Source Review

A Part D SIP must contain a provision requiring that no permit for the construction or operation of certain sources of pollution shall be issued unless

**27.** In their reply brief, petitioners claim that they do not challenge the reasonableness of the EPA's policy in general. They do contend, however, that it is arbitrary and capricious to apply it to Galveston County. Petitioners argue in effect that the EPA was required to create an exception to its valid general policy because, they say, the EPA's own past studies have shown that NOx "emission density" for Galveston and some other Texas counties designated as "rural" is comparable to that of "urban" Harris County. Petitioners cite two somewhat out-of-date studies and ask that they be added to the record in this case. We decline to do so for two reasons. First, this court has no competence to evaluate the import of these documents. We do not know whether the "NOx emission density" in rural areas results only from sources located in the rural areas or may also result from sources located in urban areas. Second, the EPA has not had an opportunity to respond to this material. We do not deem this an appropriate case to add the material and require the EPA to make a surreply. Petitioners had adequate notice of the reasons behind the EPA's policy. They have no excuse for not including materials on rural NOx in the original record.

**28.** Petitioners also rely on an alleged inconsistency between an EPA internal memorandum of August 23, 1979 and the EPA's final conclusion that the SIP contained enforceable TSP measures. The memorandum in question merely refers to the part of the EPA's August 1 notice proposing conditional approval of part of the TSP portion of the SIP, 44 Fed.Reg. 45204, 45208 (1979); the EPA's final action was based on the state's commitment to fulfill the conditions proposed. *Compare id. with* 45 Fed.Reg. at 19235. We fail to perceive any inconsistency between these documents.

the permitting agency determines that—
... by the time the source is to commence operation, total *allowable* emissions from [all sources] will be sufficiently less than total emissions from existing sources *allowed* under the applicable implementation plan ... so as to represent (when considered together with the plan provisions required under section 7502 of this title) reasonable further progress (as defined in section 7501 of this title).

CAA § 173(1)(A), 42 U.S.C. § 7503(1)(A) (emphasis added); *see id.* § 172(b)(6), 42 U.S.C. § 7502(b)(6). The EPA conditionally approved the provisions for this "new source review" in the Texas SIP. 45 Fed. Reg. at 19235–36.

Petitioners' single objection to the conditional approval is that, in formulating the SIP, the EPA has permitted Texas to set "allowable" emissions at a higher level than actual emissions. Therefore, petitioners claim, the TACB will be able to offset increased emissions from new sources with paper reductions in "allowable" emissions from old sources. The result of the new source review could be an increase in actual emissions.[29]

■ The EPA's answer is that the very terms of the statute permit the use of "allowable" emissions as a baseline. So long as the implementation plan is based on "allowable" emissions and provides that the emissions allowed will conform to the national standards as required by the statute, the EPA argues, the Texas approach is con-

sistent with the statutory language. We cannot say this interpretation is an unreasonable one.[30] Indeed, it is fully supported by the legislative history of § 173.[31]

### G. *Failure to Meet the Requirements of Section 110 of the Act*

Petitioners argue that the Part D revisions should have been disapproved because they did not meet the requirements of § 110 of the Act. We are troubled by the question whether we have jurisdiction of these claims. Petitioners' § 110 claims are directed not at the adequacy of the Part D revisions, but rather at alleged continuing deficiencies in the state's overall implementation plan. Section 307(b)(1) of the Act gives us jurisdiction of petitions for direct review of any "final action" of the Administrator filed within sixty days after notice of such action appears in the *Federal Register*. 42 U.S.C. § 7607(b)(1). Thus, we can review petitioner's claims only if the alleged deficiencies were required to be remedied in the Part D revisions.

■ First, petitioners claim that the Part D revisions did not meet the requirement of § 110(a)(2)(A)(ii), 42 U.S.C. § 7410(a)(2)(A)(ii), that a SIP "specif[y] a reasonable time at which" the national secondary standards will be met. Since Part D requires that the SIP revisions "shall provide for attainment of" both primary and secondary standards in nonattainment areas "as expeditiously as practicable," CAA § 172(a), 42 U.S.C. § 7502(a), we believe

---

**29.** There is absolutely no basis in the record for us to determine whether Texas is actually carrying out its new source review in this manner or that the result of the review is an increase in actual emissions. For purposes of this decision, however, we will assume that petitioners' allegations are true.

**30.** Petitioners rely on the definitions section of Part D for their argument that "allowable" must mean "actual." To identify a "nonattainment area," the state and the EPA may use "monitored data" or "air quality modeling." CAA § 171(2), 42 U.S.C. § 7501(2). Petitioners claim that since "monitored data" identifies actual emissions, and since Texas used this approach to identify its "nonattainment areas," it should not now be allowed to use a "model-

ing" approach—*i.e.*, setting baseline "allowable" emissions and calculating reductions therefrom—in its implementation plan. We do not see why this must necessarily be so. If the EPA has determined that the emissions allowed under the plan will ultimately conform to the national standards—a determination petitioners have not shown to be unreasonable—then the agency has no duty to demand that the state use a different method, even if another method might be preferable.

**31.** *See* H.R.Conf.Rep. 564, 95th Cong., 1st Sess. 157 (1977) ("The baseline for calculating offsets is the implementation plan in effect at the time of an application for a permit for a new or modified source.").

that the state was required to specify in its Part D revisions the time at which the secondary standards would be met. Petitioners are simply incorrect, however, in claiming that the state has not done so. *See* 45 Fed.Reg. 19231, 19245 (1980).

▮ Second, petitioners claim that the Texas Part D revisions do not meet the requirements of § 110(a)(2)(J), 42 U.S.C. § 7410(a)(2)(J), because they do not meet the requirements of Part C of Subchapter I of the Clean Air Act, §§ 160–169A, 42 U.S.C. §§ 7470–7491. Part C, which was also added by the 1977 Amendments, concerns SIP requirements for the prevention of significant deterioration. The schedule for compliance with Part C, however, is different from the schedule for compliance with Part D. Part D requires the Administrator to promulgate regulations providing for the "prevention of significant deterioration" in certain areas. CAA §§ 161, 169A(a)(4), 42 U.S.C. §§ 7471, 7491(a)(4). The state then has nine months to revise the SIP. 1977 Amendments, Pub.L. No. 95–95 § 406(d)(2)(B), 91 Stat. 685 *as amended by* Pub.L.No.95–190 § 14(b)(6), 91 Stat. 1393 (see note under 42 U.S.C. § 7401). Petitioners have pointed to no Part C regulation which would have required Texas to submit Part C revisions to its SIP. Thus, we cannot infer that the approval and conditional approval of the Texas Part D revisions was a "final action" on the state's duty to comply with Part C. We have no basis for assuming jurisdiction of this claim.

We reach a similar conclusion with respect to petitioners' claim that the Texas Part D revisions failed to comply with § 110(a)(2)(K), 42 U.S.C. § 7410(a)(2)(K). This provision, also added by the 1977 Amendments, Pub.L. No. 95–95 § 108(b), 91 Stat. 685, required every state to revise its SIP to

require[ ] the owner or operator of each major stationary source to pay to the permitting authority as a condition of any permit required under this chapter a fee sufficient to cover—

(i) the reasonable costs of reviewing and acting upon any application for such a permit, and

(ii) if the owner or operator receives a permit for such source, whether before or after August 7, 1977, the reasonable costs (incurred after August 7, 1977) of implementing and enforcing the terms and conditions of any such permit (not including any court costs or other costs associated with any enforcement action).

42 U.S.C. § 7410(a)(2)(K). Each state was to submit its SIP revision to comply with this provision by August 7, 1978. 1977 Amendments, Pub.L.No.95–95 § 406(d)(2)(A), 91 Stat. 685 *as amended by* Pub.L. No.95–190 § 14(b)(6), 91 Stat. 1393 (see note under 42 U.S.C. § 7401).

We do not see how the approval and conditional approval of the Texas Part D revisions is a "final action" on the requirements of § 110(a)(2)(K). For all the record before us shows, Texas may have submitted a SIP revision attempting to comply with this provision on August 7, 1978. The Administrator may have approved it. If this were the case, petitioners' challenge would not be timely. If, as petitioners' cursory treatment of this issue seems to indicate, Texas has never submitted the required SIP revision, then the appropriate remedy would be a district court action to compel the Administrator to perform a nondiscretionary duty, CAA § 304(a)(2), 42 U.S.C. § 7604(a)(2),[32] not a petition to this court for review of a "final action" of the Administrator under § 307(b)(1), 42 U.S.C. § 7607(b)(1). Because we have no basis for

---

**32.** Petitioners did file an action in district court pursuant to § 304(a)(2); as we have noted above, *see* note 1 *supra*, we decide the appeal from the dismissal of that suit today. Petitioners did not allege in their complaint in that action that the Administrator had failed to perform his duty, under § 110(c)(1), to promulgate a provision for the Texas SIP requiring the collection of fees. This omission may have been inadvertent, since petitioners did complain of the failure in the notice they gave as a prerequisite to their citizens' suit under § 304(b), 42 U.S.C. § 7604(b). Nevertheless, petitioners did not make an allegation in their complaint or raise the point on appeal.

concluding that the SIP provision required by § 110(a)(2)(K) should have been included in the state's Part D revisions, we have no "final action" to review.

## H. *Designation of Nonattainment Areas*

Petitioners contend that the EPA should have designated more areas of Texas as nonattainment areas. As we have recounted above,[33] the EPA published initial designations and solicited comments on March 3, 1978, and then published a "final rulemaking" designating the nonattainment areas on September 11, 1978. 43 Fed.Reg. 40412. The EPA argues that petitioners' challenge is not timely because its petitions were not "filed within sixty days from the date notice of ... promulgation ... appear[ed] in the Federal Register." CAA § 307(b)(1), 42 U.S.C. § 7607(b)(1).

Petitioners' sole answer to the applicability of the sixty-day time bar is a citation to *United States Steel Corp. v. USEPA*, 595 F.2d 207, *clarified*, 598 F.2d 915 (5th Cir. 1979). In that case, the EPA argued that the nonattainment designations were not final actions, but were merely a step in the Part D revision process, and that judicial review should await final agency action on the state SIP revisions. We assumed for the sake of argument that the EPA was correct, *see id.* at 211, 212 n.10, but we held that the designations at issue were ripe for review because they had immediate, adverse consequences on the petitioning steel companies, *id.* at 211–12.

Now that the issue is squarely before us and we have considered it more fully, we cannot accept the theory that the nonattainment designations are merely a step in the Part D revision process. The designations published by the EPA were not required by Part D, but by § 107(d) of Part A, 42 U.S.C. § 7407(d). That section makes it clear that the designations are not made solely for purposes of Part D, but "[f]or the purpose of transportation control planning, Part D ... (relating to nonattainment), Part C ... (relating to prevention of significant deterioration of air quality), and for other purposes." CAA § 107(d)(1), 42 U.S.C. § 7407(d)(1). Since the effects of the designations are not limited to the Part D revision process, acceptance of petitioners' argument that the designations themselves were not subject to direct review would lead to the conclusion that the designations are open to challenge any time the EPA takes final action on a Part C submission or a transportation control plan. Moreover, as the previous sections of this opinion have demonstrated, Part D provisions, like any other provisions of an implementation plan, are subject to an on-going revision process. Thus, a rule allowing direct review of designations of nonattainment areas whenever a Part D revision is approved would permit continuing, piecemeal challenges to the designations. Such a result would nullify the sixty-day limit on petitions for direct review imposed in § 307(b)(1), 42 U.S.C. § 7607(b)(1).

We think that the designations were "final actions" subject to immediate, direct review under § 307(b)(1) when they were promulgated.[34] The designations were in all respects "final"; since Texas had submitted the list of areas subject to the statute's nonattainment provisions and the EPA had substantially approved it, it was clear that nothing in the Part D revision process would lead to the addition of more nonattainment areas. The state was obviously going to base its Part D revisions on the EPA's "final" designations. It is unfair for petitioners to insist that the state start the Part D revision process all over again when they have failed to raise their arguments until the completion of the process.[35] We therefore hold that their petition

---

33. *See* section II.A. *supra.*

34. Other courts of appeals have assumed, without discussion, that the designations were open to immediate, direct review. *United States Steel Corp. v. USEPA*, 605 F.2d 283 (7th Cir. 1979), *cert. denied*, 444 U.S. 1035, 100 S.Ct.

710, 62 L.Ed.2d 672 (1980); *Sharon Steel Corp. v. EPA*, 597 F.2d 377, 379 n.3 (3d Cir. 1979).

35. We note that petitioners do not claim to have relied on the position the EPA took in the *U.S. Steel* litigation or that they were even aware that the EPA had ever taken such a position.

for direct review of the September 11, 1978 designations is untimely.

## CONCLUSION

We wish to point out several decisions we do not reach today. We do not decide that the state of Texas is complying with the Clean Air Act. We do not decide that the state's implementation plan provides for attainment of the national air quality standards as expeditiously as practicable. We do not even decide that the state's Part D revisions comply with the nonattainment requirements of the 1977 Amendments. We have before us only a document entitled "state implementation plan," and we merely decide, within the limits imposed by our institutional competence, that the petitioners have not demonstrated that the agency acted arbitrarily or capriciously in determining that the document complied with certain statutory requirements.

Petitioners have raised many substantial issues concerning the Clean Air Act and the state's efforts to comply with it. We have attempted to treat them as thoroughly as the submissions of the parties and our independent research into the law would allow. We dislike having to decide such issues on the basis of the inadequate record and the inadequate briefing we have received in this case. As for the record, we have complained before about the awkwardness of this review procedure; the best we can do is refer to Judge Clark's cogent concurring statement in *Texas v. EPA*, 499 F.2d at 321–22.

The petitions are DENIED.