363 F.3d 1013
 UNIVERSAL HEALTH SERVICES INC., a Delaware corporation, doing business through its wholly-owned subsidiaries; Auburn Regional Medical Center Inc., a Washington corporation dba Auburn General Hospital; UHSOF Belmont Inc., an Illinois corporation fdba Belmont Community Hospital; Northwest Texas Healthcare System, a Texas corporation fka Dallas Family Hospital Inc. dba Dallas Family Hospital; UHSOF Manatee Inc., a Florida corporation fka Doctors' Hospital of Hollywood, Inc., dba Doctors' Hospital of Hollywood; Charlotte Medical Center Inc., a Louisiana corporation fka UHS of De La Ronde Inc., fdba De La Ronde Hospital; McAllen Medical Center Inc., a Texas corporation fdba McAllen Medical Center; UHSOF River Parishes Inc., a Louisiana corporation dba River Parishes Medical Center; Valley Hospital Medical Center Inc., a Nevada corporation fka Universal Health Services of Nevada Inc., dba Valley Hospital Medical Center; UHSOF Delaware Inc., a Delaware corporation fka Panorama Community Hospital Inc., dba Panorama Community Hospital; UHSOF Florida Inc., former General and Limited Partner of Doctors' General Hospital Ltd., dba Universal Medical Center; Victoria Regional Medical Center Inc., fka
Center Inc., fka Doctors Hospital of Victoria Inc., dba Victoria Regional Medical Center; Wellington Regional Medical Center Incorporated, dba Wellington Regional Medical Center; Inland Valley Regional Medical Center, Inc., a California corporation fka Universal Health Services of Inland Valley Inc., dba Inland Valley Regional Medical Center and Westlake Medical Center Inc., dba Westlake Medical Center; Sparks Family Hospital Inc., a Nevada corporation general partner of Northern Nevada Medical Center LP, formerly Sparks Reno Partnership LP, a Delaware limited partnership, dba Northern Nevada Medical Center, fdba Sparks Family Hospital; Doctors' Hospital of Shreveport Inc., a Louisiana corporation, fka UHS of Shreveport Inc., dba Doctors' Hospital of Shreveport; Brookwood Health Services, Inc., dba Brookwood Medical Center; West Alabama General Hospital, formerly owned and operated by West Alabama General Hospital Inc.; Central Arkansas Hospital Inc., dba Central Arkansas Hospital; Saint Mary's Regional Medical Center Inc., dba Saint Mary's Regional Medical Center; National Park Medical Center Inc., dba National Park Medical Center; AMI/HTI Tarzana Encino Joint Venture, dba Encino Tarzana Regional Medical Center (Encino); Circle City Medical Center, formerly owned and operated by Circle City Medical Center Inc.; Medical Center of Garden Grove Inc., dba Garden Grove Hospital and Medical Center, fka Medical Center of Garden Grove; Valley Doctors' Hospital, dba Medical Center of North Hollywood; New Hospital South Bay Inc., dba South Bay Hospital; Sierra Vista Hospital Inc., dba Sierra Vista Regional Medical Center; San Dimas Community Hospital; Amisubof California Inc., dba Encino Tarzana Regional Medical Center (Tarzana), fka Tarzana Regional Medical Center; AMISUB (Irvine Medical Center) Inc., dba Irvine Regional Hospital and Medical Center, fka Irvine Medical Center; Brookwood Medical Center of Orlando Inc., general partner of Doctors' Mercy Hospital Ltd., dba Medical Center of Orlando; Palm Beach Gardens Community Hospital Inc., dba Palm Beach Gardens Medical Center; Lifemark Hospitals of Florida Inc., dba Palmetto General Hospital; Memorial Hospital of Tampa Ltd., dba Memorial Hospital of Tampa; AMISUB (North Ridge Hospital) Inc., dba North Ridge Medical Center; Hospital Constructors Ltd., dba Town and Country Hospital; Tenet Healthsystems Spalding Inc., dba Spalding Regional Hospital, fka Griffin Spalding Hospital; North Fulton Medical Center Inc., dba North Fulton Regional Hospital; Lifemark Hospital of Louisiana Inc., dba Kenner Regional Medical Center, fka St. Jude's Regional Medical Center, fka St. Jude's Medical Center; AMISUB (Culver Union Hospital) Inc., dba Culver Union Hospital; Lucy Lee Hospital Inc., dba Three Rivers Healthcare-North Campus, fka Lucy Lee Hospitals; Lifemark Hospitals of Missouri Inc., dba Columbia Regional Hospital; Creighton St. Joseph Regional Healthcare System LLC, dba St. Joseph Hospital; AMISUB of North Carolina Inc., dba Central Carolina Hospital; Frye Regional Medical Center Inc., dba Frye Regional Medical Center; Amisub of South Carolina Inc., dba Piedmont Healthcare System, fka Piedmont Medical Center; East Cooper Community Hospital Inc., dba East Cooper Regional Medical Center, fka East Cooper
Community Hospital; AMISUB (SFH) Inc., dba Saint Francis Hospital; Tenet Healthcare Ltd., dba Brownsville Medical Center; Bellaire General Hospital, formerly owned and operated by Bellaire General Hospital Inc.; Tenet Healthcare Ltd., dba Mid-Jefferson Hospital; Tenet Healthcare Ltd., dba Park Place Medical Center; Tenet Healthcare Ltd., dba Nacogdoches Medical Center; Tenet Healthcare Ltd., dba Park Plaza Hospital; Odessa Hospital Inc., dba Odessa Hospital, aka Odessa Women's and Children's Hospital; Aiken Regional Medical Centers Inc., dba Aiken Regional Medical Centers; UHSOF Puerto Rico Inc., dba Hospital San Francisco; UHSOF Puerto Rico Inc., dba Hospital of San Pablo; UHSOF New Orleans Inc., a Louisiana corporation dba River Parishes Hospital; Valley Health System LLC, a Nevada limited liability corporation, fka Universal Health Services of Nevada Inc., dba Valley Hospital Medical Center; Westlake Medical Center Inc., a California corporation dba Westlake Medical Center; Tenet MGH Inc., an Arizona corporation fka Mesa General Hospital Medical Center Inc., dba Mesa General Hospital Medical Center; Tenet Healthsystem TGH Inc., an Arizona corporation fka Tucson General Hospital Inc., dba Tucson General Hospital; NAI Community Hospital of Phoenix Inc., an Arizona corporation dba Community Hospital Medical Center; AHM WCH Inc., fka Woodruff Community Hospital; St. Luke Medical Center, a California corporation dba St. Luke Medical Center; Brotman Partner LP, dba Brotman Medical Center; Whittier Hospital Medical Center Inc., a California corporation dba Whittier Hospital Medical Center; CVHS Hospital Corporation, dba Centinela Hospital Medical Center; Valley Community Hospital, dba Valley Community Hospital; Midway Hospital Medical Center Inc., a California corporation dba Midway Hospital Medical Center; Santa Ana Hospital Medical Center Inc., a California corporation dba Santa Ana Hospital Medical Ctr/Doctors Hospital of Santa Ana AHM CGH Inc., dba Chapman General Hospital; Monterey Park Hospital; Harbor View Health Partners LP, dba Harbor View Medical Center; Tenet Healthsystem DMC Inc., an Iowa corporation fdba Davenport Medical Center; GULF COAST Community Hospital Inc., dba Gulf Coast Medical Center; SC Management Inc., dba Twin Rivers Regional Medical Center; Tenet Healthsystem WP Inc., dba Woodland Park Hospital; SC San Antonio Inc., dba Southwest General Hospital; Tenet Healthsystem QA Inc., dba Lander Valley Medical Center, Plaintiffs-Appellants,
v.
Tommy G. THOMPSON, Secretary of the United States Department of Health and Human Services, Defendant-Appellee.
 No. 02-56611.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted December 3, 2003.
 Filed April 13, 2004.
 
 1
 Lloyd A. Bookman and Byron J. Gross, Hooper, Lundy & Bookman, Inc., Los Angeles, California, for the plaintiffs-appellants.
 
 
 2
 R. Craig Green, Appellate Staff Attorney, Civil Department, Department of Justice, Washington, D.C., for the defendant-appellee.
 
 
 3
 Appeal from the United States District Court for the Central District of California, Stephen V. Wilson, District Judge, Presiding.
 
 
 4
 Before BEEZER, KOZINSKI, Circuit Judges, and SCHWARZER,* Senior District Judge.
 
 SCHWARZER, Senior District Judge:
 
 5
 These actions challenge the rates at which the government reimbursed hospitals participating in Medicare for certain inpatient treatment expenses during the fiscal years (FYs) 1991 to 1996. The plaintiffs are seventy-nine hospitals and two healthcare corporations (collectively, hospitals) who contend that the Secretary of the United States Department of Health and Human Services (the Secretary) acted in an arbitrary and capricious fashion in setting the thresholds for so-called "outlier payments" by which hospitals are reimbursed for patients with abnormally high costs. They argue that the Secretary committed four errors of methodology in arriving at the thresholds which determine the hospitals' entitlement to additional reimbursement. On cross-motions for summary judgment, the district court entered judgment for the Secretary, holding that the hospitals had waived these asserted errors by failing to raise them in the notice-and-comment rulemakings before the Secretary. The district court had jurisdiction under 42 U.S.C. § 1395oo(f) and we have jurisdiction under 28 U.S.C. § 1291. For the reasons stated below, we affirm.
 
 STATUTORY AND REGULATORY BACKGROUND
 
 The Statutory Framework
 
 
 6
 Medicare provides reimbursement for certain healthcare costs for eligible persons. See 42 U.S.C. § 1395-1395ggg. Congress established a "Prospective Payment System" (PPS) to reimburse hospitals for the operating costs of inpatient healthcare services rendered to Medicare beneficiaries. Social Security Amendments, Pub.L. No. 98-21, 97 Stat. 65 (1983) (codified as amended at 42 U.S.C. § 1395ww(d)); 42 C.F.R. Pt. 412 (2001). PPS reimburses hospitals for inpatient Medicare services according to an average per-patient standardized rate. See 42 U.S.C. § 1395ww(d)(3)(A), (D). The Secretary calculates the standardized rate prospectively based on adjusted estimates of total Medicare reimbursements for the upcoming fiscal year. See id. § 1395ww(d)(2)(A)-(C); 42 C.F.R. § 412.62. To calculate reimbursement for actual patients, the Secretary each year adjusts the average standardized rate by a multiplier based on the average cost of diagnosing and treating patients with similar conditions, so-called "diagnosis-related groups." (DRGs). See 42 U.S.C. § 1395ww(d)(3)-(4), (5); 42 C.F.R. § 412.60.
 
 
 7
 For treatment of patients with abnormally high costs, the PPS provides additional reimbursement through "outlier payments." Health care providers can seek outlier payments where either the length of a patient's hospital stay sufficiently exceeded the stay of others in her DRG or a patient's treatment costs sufficiently exceeded the adjusted standardized rate. Such outlier payments are intended to compensate providers for some of the costs of providing such atypically expensive services. See 42 U.S.C. § 1395ww(d)(5)(A).
 
 
 8
 The Medicare statutes require the Secretary prospectively to set "outlier thresholds" that determine which cases are costly enough to warrant additional payments. By statute, the Secretary must select outlier thresholds under which projected total outlier payments will "not be less than 5 percent nor more than 6 percent of the total payment projected ... based on DRG prospective payment rates for discharges in that year." Id. § 1395ww(d)(5)(A)(iv). The Secretary therefore adjusts past data to project total DRG-based payments, chooses an outlier target between five and six percent, and selects outlier thresholds designed to achieve that target. Thus, if past data indicated that total DRG-based reimbursements would be $100 billion in the next fiscal year, and the outlier target were 5.1%, the Secretary would use models to select outlier thresholds to yield projected total outliers of $5.1 billion. To preserve budget neutrality, the standardized rate for nonoutlier cases would be reduced by a percentage equal to the Secretary's outlier target. Id. § 1395(ww)(d)(3)(B); 42 C.F.R. § 412.62(h).
 
 
 The Rulemaking Proceedings
 
 
 9
 For each FY at issue, the Secretary issued a notice of proposed rulemaking to solicit comments on the upcoming year's proposed outlier target, outlier thresholds, and methods used to calculate such thresholds.[1] The Secretary then promulgated a final rule discussing public comments and establishing that year's target, thresholds, and calculations. During the proceedings for each FY from 1991 to 1996, interested parties submitted comments concerning outlier payments; 4731 comments were received by the Secretary. It is undisputed that none presented the specific arguments proffered by the hospitals in these cases.
 
 
 10
 In selecting outlier thresholds, the Secretary adjusted past data to project total DRG-based reimbursements for the upcoming fiscal year, using mathematical models to calculate thresholds predicted to achieve the outlier target. The Secretary started with the hospitals' most recent billing information and transformed it into estimates of their future costs. In FYs 1991, 1992 and 1993, the Secretary adjusted historical charge data to inflation — adjusted dollars and then converted inflation — adjusted charges into cost data using the most recent "cost-to-charge ratio" data to arrive at reimbursable costs. In FYs 1994, 1995 and 1996, the Secretary changed to a "cost inflation" approach, converting historical charge data to cost data and then adjusting them for inflation to the projected year.
 
 
 The Hospitals' Contentions
 
 
 11
 In these cases, the hospitals contend that the Secretary's outlier thresholds for FYs 1991 to 1996 were arbitrary and capricious. They proffer four arguments: (1) for FYs 1992, 1993, 1995 and 1996, the Secretary failed to adjust his calculations retrospectively for the previous year's overestimation of outlier payments; (2) for FYs 1991 to 1993, the Secretary's charge inflation calculations did not account for declines in cost-to-charge ratios; (3) for FYs 1994 to 1996, the Secretary's cost inflation calculations failed to adjust for a declining rate of cost inflation; and (4) for FYs 1994 to 1996, the Secretary's cost inflation analysis failed to adjust for upward trends in the "case mix" of nonoutlier cases. The Secretary's failure to make these adjustments resulted in unduly high outlier thresholds, meaning that fewer cases qualified as outliers and fewer outlier payments were made.
 
 
 The District Court Proceedings
 
 
 12
 The hospitals filed these actions seeking reimbursement for alleged shortfalls from FY 1991 to 1996.[2] They sought reimbursement of the difference between actual total outlier payments and the target percentage (5.1%) of actual DRG-based payments for each year, approximately $3.7 billion over the six-year period.
 
 
 13
 The district court did not reach the merits of the claims. Instead, on the authority of this Court's decision in Exxon Mobil Corp. v. EPA, 217 F.3d 1246 (9th Cir. 2000), the court held that the hospitals had waived the arguments they advanced in these actions for neither they nor anyone else had raised them during the relevant comment periods. The court further found that there were no exceptional circumstances excusing waiver for any of the hospitals' current arguments. The court granted the Secretary's motion for summary judgment. This appeal followed.
 
 STANDARD OF REVIEW
 
 14
 We review a grant of summary judgment de novo. EEOC v. Luce, Forward, Hamilton & Scripps, 345 F.3d 742, 746 (9th Cir.2003). "We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." Id. "Here, the facts underlying the district court's conclusion ... are not in dispute; therefore, the only question we must determine is whether the district court correctly applied the law." Id. (quotation and citation marks omitted).
 
 DISCUSSION
 
 15
 In Exxon Mobil, we held that a party's failure to make an argument before the administrative agency in comments on a proposed rule barred it from raising that argument on judicial review. We said, after summarizing the petitioners' arguments challenging the EPA's interpretation of the Clean Air Act:
 
 
 16
 Petitioners have waived their right to judicial review of these final two arguments as they were not made before the administrative agency, in the comment to the proposed rule, and there are no exceptional circumstances warranting review.
 
 
 17
 217 F.3d at 1249 (citation omitted).
 
 
 18
 The hospitals agree that Exxon Mobil, as a notice-and-comment rulemaking case, is directly on point, but would have us depart from Circuit precedent. They argue that the Exxon Mobil decision is lacking in discussion or analysis, that it should have been decided on statutory rather than common law grounds, and that it is inconsistent with Ninth Circuit authority. We find these arguments unpersuasive."[W]here a panel confronts an issue germane to the eventual resolution of the case, and resolves it after reasoned consideration in a published opinion, that ruling becomes the law of the circuit, regardless of whether doing so is necessary in some strict legal sense." United States v. Johnson, 256 F.3d 895, 914 (9th Cir.2001) (en banc) (opinion of Kozinski, J.). See also Hart v. Massanari, 266 F.3d 1155, 1171 (9th Cir.2001), stating, "Once a panel resolves an issue in a precedential opinion, the matter is deemed resolved, unless overruled by the court itself sitting en banc, or by the Supreme Court....[A] later three-judge panel considering a case that is controlled by the rule announced in an earlier panel's opinion has no choice but to apply the earlier-adopted rule." The issue of waiver was clearly germane to the resolution of Exxon Mobil and the court resolved it, after reasoned, if terse, consideration, in a published opinion. Thus, even if we disagreed with it, we are bound by the holding of Exxon Mobil.
 
 
 19
 Exxon Mobil is consistent with the decisions of every other circuit to have addressed the issue of waiver in notice-and-comment rulemaking. See Nat'l Wildlife Fed'n v. EPA, 286 F.3d 554, 562 (D.C.Cir.2002); BCCA Appeal Group v. EPA, 355 F.3d 817, 828-29 & n. 10 (5th Cir.2003);[3] Mich. Dep't of Envtl. Quality v. Browner, 230 F.3d 181, 183 n. 1 (6th Cir.2000); USA Group Loan Servs. v. Riley, 82 F.3d 708, 713-14 (7th Cir.1996); 1000 Friends of Md. v. Browner, 265 F.3d 216, 228 n. 7 (4th Cir.2001) (stating in dictum that the waiver rule "has been rather routinely applied in [rulemaking] cases").
 
 
 20
 The hospitals seek support for their position in Sims v. Apfel, 530 U.S. 103, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000).[4] The Court there held that a claimant for Social Security benefits who exhausted his administrative remedies did not also have to exhaust issues in a request for review by the Social Security Appeals Council.[5] The Court's decision turned on the unique nature of Social Security benefit proceedings and offers no guidance relevant to rulemaking, although Justice O'Connor observed in her concurring opinion, "In most cases, an issue not presented to an administrative decisionmaker cannot be argued for the first time in federal court." Id. The hospitals argue, however, that here, as in Sims, the Secretary did not put them on notice that they must comment on any issue raised in the Federal Register or waive the right to challenge such regulations if they prove to have an adverse effect. The argument simply confuses matters because the waiver rule only forecloses arguments that may be raised on judicial review; it is not an exhaustion of remedies rule that forecloses judicial review. They also argue that such a rule "would require everyone who wishes to protect himself from arbitrary agency action not only to become a faithful reader of the notices of proposed rulemaking published each day in the Federal Register, but a psychic able to predict the possible changes that could be made in the proposal when the rule is finally promulgated," quoting Seabrook v. EPA, 659 F.2d 1349, 1360-61 (5th Cir.1981).[6] This argument is wholly inapposite here in light of the district court's findings:
 
 
 21
 The Plaintiffs have not sustained their burden. These Plaintiffs were on notice that the outlier threshold rulemaking was relevant to them. The annual choice of outlier thresholds had direct impact on the potential cost exposure of hospitals in the Medicare acute inpatient program. Clearly the annual ratemaking was a significant concern to the entire healthcare industry, and particularly for hospitals — like the Plaintiffs here — that participated in the Medicare program.
 
 
 22
 The size of the administrative record itself shows the interest taken by the industry in the comment process. The fact that this was an annual ratemaking process rather than ad hoc agency action counters any notion that the Plaintiffs were blindsided by the parameter choice. In fact, several comments in the record addressed the accuracy of the [Secretary's] forecasting. None of the comments, however, raised the current arguments advanced by the Plaintiffs.
 
 
 23
 Appellants' Excerpts of R. at 191.
 
 
 24
 The hospitals argue that even if waiver applied, exceptional circumstances excuse their failure to raise their arguments in the rulemaking proceedings. First, they argue that the Secretary was on notice in 1992, 1993, 1995 and 1996 that outlier shortfalls were a serious problem and that some "general adjustment[s]" had to be made. Because the hospitals failed to raise this argument in the district court, it is waived. Taniguchi v. Schultz, 303 F.3d 950, 958-59 (9th Cir.2002). Second, they argue that the Secretary did not provide adequate notice of the data used to make her outlier calculations for 1991-96. The Secretary's notices of rulemaking described its purpose and operation within the PPS system. Each year's notice listed, among other things, the proposed outlier thresholds and target, evaluated the success of past years' estimates, explained methods used to calculate outlier thresholds and provided information for obtaining all data underlying the Secretary's models. Final rulemakings, in turn, listed previous years' results, identified final thresholds and calculations, and responded to comments. Thus, the Secretary's notices were clearly sufficient to provide the hospitals with the incentive to make their arguments and the factual data on which to base them.
 
 
 25
 In determining whether exceptional circumstances exist, we balance the agency's interests in applying its expertise, correcting its own errors, making a proper record, enjoying appropriate independence of decision and maintaining an administrative process free from deliberate flouting, against the interests of private parties in finding adequate redress for their grievances. See Marathon Oil Co. v. United States, 807 F.2d 759, 768 (9th Cir.1986) (citations omitted). Given that the hospitals have offered no compelling reason why they did not raise their arguments before the Secretary, we think that there is no basis for finding exceptional circumstances to exist here. See id.
 
 CONCLUSION
 
 26
 Because the hospitals failed to raise the arguments advanced in these cases in the annual notice-and-comment rulemakings determining the outlier thresholds that directly affected their Medicare reimbursements, we conclude that those arguments have been waived.
 
 AFFIRMED.[7]
 
 
 Notes:
 
 
 *
 The Honorable William W Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation
 
 
 [1]
 InAlvarado Community Hospital v. Shalala, 155 F.3d 1115 (9th Cir.1998), as amended, 166 F.3d 950 (9th Cir.1999), cited by the hospitals, we held the Secretary's determination of outlier thresholds for FY 1985 to be arbitrary and capricious. Because we do not reach the merits of the hospitals' claims, that decision has no relevance here.
 
 
 [2]
 Each of the hospitals timely appealed its final determination of outlier payment reimbursements for the relevant years to the Provider Reimbursement Review Board ("PRRB") pursuant to 42 U.S.C. § 1395oo. Between November 9, 2000, and April 3, 2001, the PRRB determined, for four separate groups of hospitals, that it lacked authority to decide the validity of the Medicare regulations governing outlier payment methodology, and permitted the hospitals to seek expedited review. Each of the four hospital groups filed suit between January 11 and June 8, 2001; the district court consolidated the actions on September 25, 2001
 
 
 [3]
 The hospitals' reliance onSeabrook v. EPA, 659 F.2d 1349 (5th Cir.1981), rejecting the application of waiver in rulemaking, is misplaced. Seabrook has not been followed outside the Fifth Circuit and has recently been undermined within it. See Texas Oil & Gas Ass'n v. EPA, 161 F.3d 923, 933 n. 7 (5th Cir.1998) (ignoring Seabrook in reaching contrary result); BCCA Appeal Group, 355 F.3d at 829 n. 10 (noting that "the court has stepped back from Seabrook's holding on waiver" and choosing "to follow Texas Oil & Gas as the most closely analogous case and the better rule of law").
 
 
 [4]
 Darby v. Cisneros, 509 U.S. 137, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993), also cited by the hospitals, is inapposite. It simply held that an appeal to a superior agency authority is a prerequisite to judicial review only when expressly required by statute or agency rule and the administrative action is made inoperative pending that review. It sheds no light on the application of waiver on judicial review.
 
 
 [5]
 Referring toSims, the First Circuit said: "The Court there rejected a waiver claim and allowed a social security applicant to raise in court an issue not raised at the Appeals Council stage. But that is entirely different from failing to offer evidence in the first instance to the ALJ, which is far more disruptive of the review function." Mills v. Apfel, 244 F.3d 1, 4 (1st Cir.2001) (citation omitted) (emphasis added).
 
 
 [6]
 See n.3, supra.
 
 
 [7]
 Appellants' request for judicial notice is DENIED